IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 10-cv-02852-RBJ-MJW

NICK and ROXANNE CATTANEO, as individuals
and as parents of ELIJAH CATTANEO

       Plaintiffs.

v.

AQUAKLEEN PRODUCTS, INC.,

       Defendant.

---

## ORDER on PENDING MOTIONS

---

This is a personal injury action removed by the defendant from the Adams County District Court.  It is set for a 10-day jury trial commencing October 15, 2012.  A number of motions are ripe for decision and are addressed in this order.

**FACTS**

Plaintiffs Nick and Roxanne Cattaneo sue on behalf of themselves and their child Elijah. In their Complaint [docket #1-3] plaintiffs allege that in June 2006 they purchased a water refinement system for their home from AquaKleen Products, Inc.  However, it is undisputed that AquaKleen's installer, who was not a licensed plumber, installed the system improperly, creating a "cross-connection" between the AquaKleen system and a sewer pipe in the home.  Plaintiffs claim that, as a result, sewage contaminated their water supply, which in turn caused them to sustain illnesses and damages.

In what might be regarded as a classic case of overkill, plaintiffs asserted 11 claims stating different theories of liability.  Over time the claims have been trimmed down a little.  At

1

the present time plaintiff continues to press seven claims on behalf of Mr. Cattaneo and the child

and one claim on behalf of Mrs. Cattaneo.  The claims are (1) negligence, (2) negligence per se,

(3) respondeat superior, (4) negligence under apparent authority, (5) deceptive trade practices,

(6) negligent hiring, training and supervision, (7) outrageous conduct (the latter being the only

remaining claim of Mrs. Cattaneo).

Not to be outdone, after denying most of the factual allegations, AquaKleen asserted 31

separate defenses.  [#8].  In addition AquaKleen named the South Adams County Water &

Sanitation District; one of the District's employees, Charlene Seedle; and other "unknown"

governmental entities or individuals as "non-parties at fault."  [#27].

**CONCLUSIONS**

**[Defendant's] Motion for Summary Judgment [docket #60]: GRANTED IN PART**

**AND DENIED IN PART.**

Defendant's motion for summary asks the Court to dismiss all claims or "such claims as

the court sees fit for dismissal."  The parties' briefing on this motion is extensive.  One must

remember, however, that summary judgment is a limited remedy.  It requires courts to deny the

parties a trial only if it is shown that there are no genuine issues of material fact in dispute that a

rational jury could decide in favor of the non-moving party. Fed. R. Civ. P. 56(c).  Furthermore,

the Court must "view the evidence and draw reasonable inferences therefrom in the light most

favorable to the nonmoving party."  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance*

*Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir. 1999).

<u>Causation</u>

AquaKleen's overriding argument, applicable to all claims, is that plaintiffs have no admissible evidence that the cross-connection caused injuries or damages to the plaintiffs. That argument largely turns on whether the testimony of the plaintiffs' toxicology expert, Dr. Steven Pike, is admissible. For the reasons discussed in connection with motion #74 below, I hold that the testimony is admissible. Therefore, the motion for summary judgment cannot be granted based on lack of evidence of causation.

<u>Negligence (claims one, three, four and six)</u>

Plaintiffs allege that AquaKleen was both directly negligent, by improperly training and supervising the individuals who sold and installed the system, and liable for the negligence of the installers on theories of respondeat superior and agency. AquaKleen counters that the installers were "independent contractors" whom AquaKleen had no duty to train or supervise, and for whose negligence AquaKleen has no responsibility.

Generally speaking, one is not liable for the negligence of an independent contractor. *Huddleston by Huddleston v. Union Rural Electric Association,* 841 P.2d 282, 287 (Colo. 1992). A truly "independent" contractor, as the name suggests, operates free of the control and supervision of an "employer." However, merely labeling someone an "independent contractor" does not make it so. *Faith Realty & Development Co. v. Industrial Commission,* 460 P.2d 228, 229 (Colo. 1969). As defendant acknowledges, a key factor is whether the person hiring the individual has the right of control over the person's work. Motion [#60-2] at 10 (citing *Moses v. Diocese of Colorado,* 863 P.2d 310, 324 (Colo. 1993)).

There is substantial evidence in the record, to say the least, that AquaKleen had and exercised the right to control and supervise these purported independent contractors. AquaKleen provided whatever training these people received in selling and installing its systems. AquaKleen then sent them into neighborhoods, like the Cattaneos' neighborhood, wearing AquaKleen vests and driving AquaKleen vehicles, to solicit sales and to install the units. AquaKleen's President, Ross Levine, sent a memo to his managers after the Cattaneo incident in which he directed them to make sure that the installations are done correctly. *See* discussion of motion #83 below. When some of AquaKleen's sales people were involved in misconduct in Yuma, Arizona, AquaKleen sent a company representative, also labeled an independent contractor, to take corrective action (which apparently including firing one or more offenders and removing others from the area) and to make apologies and assurances to the local police and the public. *See* discussion of motion #88 below.

This Court is skeptical that defendants can establish that the individuals who installed the system in the Cattaneos' home and later inspected the water after receiving the Cattaneos' complaints were "independent contractors." In the context of a motion for summary judgment filed by the defendant, however, it is enough to say that, at a minimum, there are genuine disputes of material fact concerning the negligence and the vicarious liability issues.

Negligence per se (claim two)

Plaintiffs allege that the installation violated C.R.S. § 25-1-114(h), which prohibits a cross-connection between a water system supplying drinking water to the public and any pipe, plumbing facility or water system which contains water that is below minimum general sanitary standards. The obvious intent is to prohibit a connection that endangers the public's water supply. Plaintiffs have come forward with no evidence that there was contamination of a water

system supplying drinking water to the public (other than the water in their home) or that they were harmed by any such contamination (other than contamination of the water in their home). This claim is dismissed.

Deceptive Practices (claim five)

Plaintiffs allege that AquaKleen violated the Colorado Consumer Protection Act, C.R.S. § 6-1-101 et seq.  In defense of that claim against the pending motion, plaintiffs narrow it to a specific claim that AquaKleen sold the water refinement system without obtaining a required plumbing permit or contractor's license from Commerce City, thereby violating section 6-1-105(1)(z)("A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person: …(z) Refuses or fails to obtain all governmental licenses or permits required to perform the services or to sell the goods, food, services, or property as agreed to or contracted for with a consumer.").

Defendant did not address whether a plumbing license or contractor's permit was required, and therefore, for present purposes, the Court assumes that a necessary governmental license or permit was not obtained.  Defendant instead argues that plaintiffs have no evidence of a "public impact." *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino, Inc.,* 62 P. 3d 142, 146-47 (Colo. 2003).  I disagree, for the reason discussed below in connection with motion #88.

In its reply defendant argues, based upon Washington law, that a purely personal injury claim cannot be the basis of a CCPA claim.  Because the argument was raised for the first time in the reply, and plaintiffs have not had the opportunity to address it, the Court will not address it.

Outrageous conduct (seventh claim)

Plaintiffs allege that AquaKleen

- "knowingly caused the home's potable water supply to be contaminated by raw sewage,"

- "knowingly disregarded Plaintiffs' reports of foul smelling water,"

- "knowingly misrepresented the quality of the water," and

- "knowingly encouraged Plaintiffs Nick and Roxanne Cattaneo and their son Elijah, to continue to consume and use the water."

Complaint [#1-3] at ¶¶ 167-69.

Colorado courts have set a high bar for establishing a prima facie case of outrageous conduct, from the inception of this tort in *Rugg v. McCarty,* 476 P.2d 753, 756 (Colo. 1970) to more recent cases including those cited by the defendant. *See Coors Brewing Co. v. Floyd,* 978 P.2d 663, 665 (Colo. 1999); *Culpepper v. Pearl Street Building,* 877 P.2d 877, 882 (Colo. 1994). Plaintiffs must have evidence that, if believed, would establish that (1) AquaKleen engaged in extreme and outrageous conduct (meaning conduct so atrocious as to go beyond all possible bounds of decency and to be utterly intolerable in a civilized society); (2) AquaKleen did so recklessly or with the intent to cause severe emotional distress; and (3) the conduct caused severe emotional distress. *See Culpepper,* 877 P.2d at 882.

Plaintiff supports its claim by reference to evidence that (1) AquaKleen's President, Mr. Levine, characterized the cross-connection as outrageous; (2) despite knowledge of the dangers of the cross-connection and the foul odors that AquaKleen personnel observed, they repeatedly told plaintiffs that they had tested the water, and it was safe; and (3) they thereby allowed

plaintiffs to continue to be exposed to sewage-contaminated water for six months until a plumber exposed the problem.  Response [#75] at 45.

Mr. Levine's comment certainly doesn't establish this claim.  There is no evidence that the improper connection itself was other than a negligent act.  While contamination of a home's water with sewage (if that occurred) is disgusting and might be viewed as "outrageous" in the ordinary sense of the word, the conduct – the improper connection – was not "outrageous" in the sense of the legal claim.

Plaintiffs point to evidence that when they complained to AquaKleen about the foul odor, defendant sent the salesperson, Ms. Carpio, out to investigate.  Ms. Carpio agreed that the odor was bad and took a water sample.  There is some evidence that a day or two later Ms. Carpio called and told Ms. Cattaneo that the water was fine.  R. Cattaneo Depo. [#62-6] at 53.  Mrs. Cattaneo continued to complain, and AquaKleen installed a new unit in place of the original unit. *Id.* at 54.  However, the odor did not improve, and Mrs. Cattaneo continued to complain to AquaKleen.  *Id.* at 56.  AquaKleen continued to represent that they had tested the water, and everything was fine.  *Id.* at 56-57.  Nothing further was done until a representative of the South Adams County Water District came to the house, several months later, and discovered the cross-connection.  According to Mrs. Cattaneo, AquaKleen representatives declined to disconnect the system.  The original plumbing subcontractor then disconnected the unit.  *Id.* at 59-60; Ryel Aff. [#75-6] ¶7.

If AquaKleen knowingly or recklessly sent an unqualified person to inspect and investigate, and if that person knowingly or recklessly misrepresented that she or someone else at AquaKleen had tested the water for the presence of contaminants, and if AquaKleen knowingly or recklessly failed to follow-up when more complaints were made and determine whether the

water had been properly sampled and tested, and failed or refused to take another sample and have the sample re-tested, and if as a result the Cattaneos were needlessly exposed to sewage-contaminated water for several additional months, and further if they or any of them sustained severe emotional distress damages as a result of the additional exposure, then a rational jury could find in plaintiffs' favor on this claim.  That is a lot of "if's."  However, on a motion for summary judgment, the Court construes the evidence and draws inferences in plaintiffs' favor. Accordingly, the Court declines to dismiss the seventh claim at this time.

**[Defendant's] Motion to Strike the Opinion Testimony of Plaintiff's Expert Steven Pike, M.D. [#74]: DENIED.**

Defendant moves to exclude the testimony of Dr. Pike, primarily on the ground that it is not sufficiently reliable to pass muster under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*509 U.S. 579 (1993).  Neither party has requested an evidentiary hearing or oral argument.  Therefore, the Court may consider the motion on the briefs.  *See U.S. v. Nacchio,* 555 F.3d 1234, 1251 (10th Cir. 2009).  The proponent of expert testimony has the burden to show that the testimony is admissible.  *Id.* at 1241.  The trial court plays a "gatekeeping" role.  This is not, however, a role that emphasizes exclusion of expert testimony.  As I have before, I quote my colleague Judge Kane:

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert,* was intended to relax traditional barriers to admission of expert opinion testimony.  Accordingly, courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony.  As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the caselaw after *Daubert* show that the rejection of expert testimony is the exception rather than the rule.

*Cook v. Rockwell Intern. Corp.,* 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citations omitted).

Dr. Pike is a physician with an M.D. and a M.S. in Toxicology.  He is board certified in several fields: Medical Toxicology; Occupational and Environmental Medicine; Emergency Medicine; and Industrial Hygiene.  He is plaintiffs' causation expert.  He has reviewed documents concerning the improper installation of the water refinement unit; various individuals' observations regarding the Cattaneos' water; medical records; and published literature, specifically including a publication by an epidemiologist concerning inferences of causality that was cited as an authoritative work in *Milward v. Acuity Specialty Products Group, Inc.,* 639 F.3d 11, 17-19 (1st Cir. 2011).

In brief summary, Dr. Pike's opinions are that the Cattaneos' water was contaminated by sewage and, as a result, the child contracted Hepatitis A and Mr. Cattaneo contracted Crohn's disease.  These opinions are based on inferences he draws from the facts that a cross-connection existed; the water in the home had a foul odor, allegedly coincident with the presence of the water refinement system; the water refinement system removed chlorine which had been added by the water district's treatment system as a disinfectant; the two Cattaneos developed illnesses that can be caused by exposure to sewage-contaminated water; the timing of the development of the illnesses fits the timing of the alleged contamination of the water supply; and, in his opinion, there is no plausible alternative explanation for the development of the illnesses.  Pike report [#74-6] at 47-51.

Defendants counter with the opinion of their engineering expert, Joe Tamburini.  According to Mr. Tamburini, sewage did not get into the Cattaneos' water.  In order for that to have happened, pressure in the waste line had to exceed pressure in the water line; the refinement system had to have been in backwash mode; the refinement system's waste drain valve had to have failed to close; and all of these necessary events must have occurred at the same time.

Tamburini report [#74-2] at 3-5.  He attributes the odor to a harmless sulfide compound caused by a bio-chemical reaction in the water, something that he characterizes as a common complaint in water systems and that the high sulfate concentration in water supplied by the South Adams County Water and Sanitation District could explain.  *Id.* at 5-6.

The problem here is that, apparently, no one tested the water for the presence of contamination that would be caused by sewage.  The plaintiffs did not obtain or, if they did, did not retain a water sample.  AquaKleen representatives obtained one or more samples but apparently did not have them tested for this type of contamination and did not retain the samples.  The South Adams County Water and Sanitation District did not do so either.  The combined failure to do the elementary testing that would presumably have answered the question one way or the other has caused both parties to have to approach causation differently.

Plaintiffs rely on toxicological opinion that establishes that sewage can cause these diseases and the absence of any alternative explanation for them.  Defendant relies on engineering opinion that renders the ability of contaminants to get into the Cattaneos' water, despite the cross-connection, unlikely.  Both opinions are rendered by qualified expert.  Both opinions are based on facts, data and inferences drawn from the facts and data.  Neither side has produced opinions of experts in the specialties of the other side, i.e., a toxicologist for the defendant or an engineer for the plaintiffs, to suggest that the retained experts have not used reliable methods or have not reliably applied the principles of their respective professions to the facts.

In short, this Court has no basis to find that these opinions are not relevant and reliable within the meaning of Rule 702.  The criticisms of Dr. Pike's opinions go to the weight to be given to them, and that is the province of the jury.

**[Defendant's] Motion in Limine to Preclude Evidence of Subsequent Remedial Measures [#83]: DENIED.**

The motion seeks a pre-trial ruling that an undated memo handwritten by AquaKleen's President should be excluded under Rule 407 of the Federal Rules of Evidence.  The memo states:

> To all managers
>
> As we discussed at the symposium last week it is imperative that you check on Installations to make sure they are being done correctly.  As you can see from the attached correspondence not only do we have to repurchase a contract but we may face further litigation.  In addition the water district and city are forbidding AquaKleen to install systems.  This is another instance of an installer connecting the water conditioner drain line directly into a sewage pipe instead of installing an air gap as required.  <u>Please</u> see that installations are done correctly.  It is our ability to remain in business that is at stake.
>
> Ross A. Levine
> President

I agree that Rule 407 makes Mr. Levine's instruction to AquaKleen managers to make sure installations are done correctly, apparently in reaction to the Cattaneos' complaints, inadmissible to prove negligence, culpable conduct or a need for instruction.  However, the evidence can nevertheless be admitted if it is relevant for another legitimate purpose and it is not unfairly prejudicial.  Plaintiffs state that they will offer the memo as evidence of AquaKleen's control over the creation of a cross-connection; the creation of other, previous cross-connections; and impeachment of Mr. Levine's credibility.

The memo is probative of AquaKleen's ability to control and supervise the installers.  Accordingly, unless AquaKleen changes its position and stipulates to liability for the negligence of the installers, the memo is admissible for that purpose.  Whether the memo or some part of it might be relevant for another permissible purpose, such as to refute any suggestion that

AquaKleen might make that this was the first cross-connection incident known to AquaKleen or to impeach the credibility of Mr. Levine, depends on what occurs during the trial.

**[Defendant's] Motion in Limine to Preclude Hearsay Testimony of Statements Made by Salespersons [#87]: DENIED.**

Plaintiffs represent that the evidence will be that after the AquaKleen unit was installed, their water had a foul odor.  They called an AquaKleen telephone number that had been provided to them by the installer to complain about poor water quality and were told that AquaKleen would send someone to inspect the system.  The salesperson who sold the system to the Cattaneos and later appeared at the home in response to the complaint, Ms. Carpio, allegedly was driving an AquaKleen van and wearing an AquaKleen vest.  Ms. Carpio ran some water and as she was doing so indicated, both by words and gestures (putting her hand over her nose), that she could smell the foul odor.  According to the defendant, she can no longer be located.  Defendant asks the Court to exclude her statements and gestures as inadmissible hearsay and, alternatively, as unfairly prejudicial under Rule 403.

The argument that these verbal and non-verbal "statements" are hearsay is based on the contention that the salesperson, like the installers, is an independent contractor and therefore cannot make admissions that bind AquaKleen.  As I have indicated, the attempt to cloak these people with the label "independent contractor" and thereby shield AquaKleen from liability for things that they do and say is underwhelming but, for now, is left as a genuinely disputed issue of material fact.  If that argument is resolved against AquaKleen, then the statements are probably admissible as non-hearsay under Rule 801(d)(2)(D).  However, even if the statements were viewed as hearsay, if the evidence is as plaintiffs represent, then the evidence is admissible under the present sense impression exception of Rule 803(1).

Defendant suggests that plaintiff's description of the statements is colored by their vested interest in the case.  Certainly defendant can so argue.  Juries are good at making credibility determinations.  The statements might be prejudicial in the sense that they tend to confirm plaintiffs' testimony about the foul odors.  That does not make them unfairly prejudicial.

**[Defendant's] Motion in Limine to Preclude Testimony Regarding AquaKleen Activities Outside of the State of Colorado [#88]: GRANTED IN PART, DENIED IN PART.**

This motion seeks to preclude evidence of allegedly wrongful conduct by AquaKleen "independent contractors" in Oregon and Arizona.  Despite the label, the fact that the incidents occurred outside the State of Colorado is essentially irrelevant to the motion.  Plaintiffs have confessed the motion insofar as it concerns the Oregon incident, and to that extent the motion is granted.

According to articles published in a Yuma, Arizona newspaper, in May 2010 a number of "independent sales contractors" working for AquaKleen became the subject of a fraud alert issued by the Yuma Police Department after it was reported that they were misrepresenting themselves as City of Yuma Water Department Employees and conducting sales operations without obtaining door-to-door solicitation licenses.  May 8, 2010 article [#88-1 at 1].  The newspaper reports that these individuals were warned to cease and desist further sales activity without a business license.  *Id.*  The second article reported that an AquaKleen representative, Roberto Repetto, apologized for the "misunderstanding."  Mr. Repetto was quoted as saying, "'[o]ur company representatives always wear a company shirt with a logo . . . (and are required to leave a business card.'"  May 17, 2010 article [#88-1 at 5].  He also indicated, according to the newspaper, that the person who might have misrepresented himself had been fired; that the

remaining sales persons were no longer conducting sales operations; and that the company had applied for licenses. *Id.*

In his deposition Mr. Levine, AquaKleen's President, testified that "some of our salesmen were going out, didn't have a sales permit, and were going door-to-door, independent contractors, and saying that they came from the water district or something to that effect." Levine Depo. [#88-3] at 262-63 (referring to page numbers in deposition transcript). He said that "we fired the people who were making those claims," then got sales licenses for the people who remained, then apologized through a full-page ad in the newspaper. *Id.* at 263. I note that he described Mr. Repetto as an independent contractor. *Id.* at 266.

Plaintiff argues that evidence regarding the Yuma incident is relevant to is claim under the Colorado Consumer Protection Act which requires, among other things, proof that an allegedly deceptive trade practice significantly affects the public. *Rhino Linings,* 62 P. 3d at 146-47. Plaintiffs' theory is that because they claim that AquaKleen did not obtain necessary permits in Colorado, the Yuma evidence, which they suggest reflects a "company-wide practice of deliberately not obtaining governmental permits until getting caught," Response [#91] at 3, is probative of a significant potential future impact on the public.

So far as I can tell, the claim here has nothing to do with sales persons misrepresenting themselves or conducting door-to-door solicitation without a license to do so. Plaintiffs point to deposition testimony of Mr. Levine to the effect that when AquaKleen goes into a state or locality it does not try to determine whether permits are necessary but instead relies on the local installers to do so. That practice is some evidence of a potential for a more widespread public impact. The Yuma incident adds little to that testimony.

However, without passing on whether the newspaper articles themselves are admissible, which hasn't been fully addressed by the parties, the Court finds that evidence regarding the Yuma incident and in particular AquaKleen's response to it is relevant to the question whether individuals whom AquaKleen labels "independent contractors" are in fact independent contractors. That is one of the central issues in the case, and the Court finds that the relevance of this evidence to that issue outweighs the possibility that there could be unfair prejudice to AquaKleen. The Court finds that the danger of unfair prejudice is minimal, as the evidence tends to indicate that AquaKleen took prompt corrective action when informed of the improper actions of some of its sales people.

**Plaintiffs' Motion in Limine Regarding Plaintiff Nick Cattaneo's Recreational Drug use [#101]: GRANTED.**

At the outset I note that plaintiffs' counsel represents, as to this and other plaintiff motions in limine, that he has "conferred with defense counsel via email." One does not "confer" via email. To confer means to talk to opposing counsel, at least by telephone, better yet in person. The whole point of the local rule (and the counterpart state court rule) is that if lawyers will only talk to each other and attempt in good faith to work out non-dispositive disputes, a great deal of the time, cost and energy that goes into motion practice might be avoided. I generally deny non-compliant motions without additional comment. In this instance, the parties have been waiting for rulings on several motions, some for quite some time, with a trial coming up in a little over a month, and for practical reasons I am electing to address all pending motions on their merits rather than generate another round of motions. That will not occur again in this Court.

The consumption of the allegedly contaminated water, and the diagnosis that Mr. Cattaneo suffered from Crohn's disease, occurred in 2006.  This motion in limine seeks to exclude evidence that Mr. Cattaneo used cocaine and marijuana in 2009 and 2010.  No medical evidence has been offered that the use of those drugs exacerbated the effects of the Crohn's disease.  However, defendant points to the fact that Mr. Cattaneo tested positively for cocaine and THC on February 4, 2010 and had a flare up of his Crohn's disease on February 15, 2010.  They analogize this causation argument to the temporal connection plaintiffs list as one factor supporting their argument that there is a causal connection between the installation of the water refinement system and the onset of the plaintiffs' illnesses.  Defendant also suggests that the evidence is relevant to both parents' claims of emotional injuries.

The "temporal proximity" analogy is unpersuasive.  Temporal proximity was one of several facts that led Dr. Pike to his causation opinion.  However, defendant has offered nothing other the temporal proximity itself to suggest that there possibly, let alone probably, is a connection between the drug use and the Crohn's flare up.  Defendant has offered no evidence that Mr. Cattaneo's drug use was so extensive and prolonged as to have a significantly adverse effect on his health.  Defendant has offered no evidence that the drug use caused either parent any significant emotional distress.  Essentially it asks the jury to speculate.

In the circumstances, absent more, the Court finds that the danger of unfair prejudice, which is inherent in any use of illegal narcotics, outweighs any potential relevance.  The motion is granted under Rules 402 and 403.

**Plaintiffs' Motion in Limine Regarding IRS Garnishment of Plaintiff Nick Cattaneo's Wages [#102]: DENIED (but without ruling that the evidence is necessarily admissible).**

Plaintiffs seek to exclude evidence that the IRS has garnished his wages since November 2010 for non-payment of taxes by a business owned by his parents in which he is listed as a corporate officer.  Defendant responds that Mr. Cattaneo became employed by this business in February 2009; that his wages were garnished to the tune of $1,200 a month beginning in November 2010; that he left this job three months after the garnishment; that he hasn't had a permanent full-time job since; and that Mr. Cattaneo and his father are contesting the tax claim. Defendant's theory of relevance is that the garnishment, not the Crohn's disease, explains his unemployment, and it also goes to his credibility, because "[p]eople who tell the truth generally pay their taxes."  Response [#111] at 3.

I have no knowledge (nor does the defendant) concerning the validity of the tax claim against the business or against Mr. Cattaneo individually.  I certainly am not prepared to accept the proposition that the fact that a (disputed) tax claim against his father's business is pending, and Mr. Cattaneo is a target because he was a corporate officer, it follows that he will not tell the truth under oath in this case.

Defendant might be on a little stronger ground with its argument that the garnishment might tend to contradict Mr. Cattaneo's claim, if he makes such a claim at trial, that he quit his job with the father's business because of Crohn's disease, or that he has not sought or obtained new employment because of Crohn's disease.  I recognize that Mr. Cattaneo is not claiming lost wages.  However, if plaintiffs attempt to introduce evidence, from Mr. Cattaneo's testimony or

otherwise, that he left his job or hasn't sought a new one because of the illness caused by the defendant (and convinces the Court that this is relevant notwithstanding his disclaim of a lost wages claim), and if the garnishment was consuming most or all of his net income as defendant contends, then the garnishment potentially is relevant to the credibility of plaintiff claim.

At this point I decline to exclude the evidence in limine.  However, on its face it does not pass muster under Rules 402 and 403.  The Court will not allow the evidence at trial unless the evidence presented, specifically including whatever consequences are claimed by the plaintiffs to result from Crohn's disease, creates a foundation for relevance.

**Plaintiffs' Motion in Limine Regarding Testimony of Justin Davis and Related Photographs, [#103]: tentatively DENIED.**

The Cattaneos sold their house to Justin Davis in December 2009.  Mr. Davis has testified in a deposition to the effect that the house was filthy and poorly maintained, and that the water tasted bad and had particles in it.  Plaintiffs seek to exclude this evidence under Rule 402, arguing that the condition of the house in December 2009 is irrelevant to its condition in the summer of 2006, and also that it should be excluded under Rule 403, because it might confuse the jury about what was contaminating the house or cause the jury to deny compensation because the plaintiffs are "untidy people, unworthy of compensation in this case."  Motion [#103] at 3-4. They also cite deposition testimony from a South Adams County Water District representative that when he was in the basement in 2006, although he saw dog stains on the floor, he felt that the basement was "fairly clean," and he observed "nothing unusual."  *Id.* at 3.

Defendant responds that the Cattaneos were the first persons to live in this residence, having lived there from 2005 until they lost the home to foreclosure in 2009.  When he bought the house Mr. Davis found the basement to be in terrible shape due to dogs' urinating and

defecating.  There were also stains on carpeting on the upper floors.  Mr. Davis apparently took pictures of these conditions and other pictures that allegedly show that the house was poorly maintained.  He testified that there was a strong odor from the dogs, and that the water quality was bad in appearance and taste.

Plaintiffs' time to respond has not run (nor had it on motion ## 101 and 102, but I granted #101 and largely granted #102).  Because my inclination is to deny this motion, I will do so "tentatively," meaning that I will keep an open mind if plaintiffs have something to submit in reply that they believe should change the ruling.  However, having considered the motion and response, I do not agree that the evidence is necessarily irrelevant.  Plaintiff's suggestion that the evidence might "confuse" the jury regarding the source of the contamination or the source of the odor is precisely what makes it potentially relevant.  It is offered as an alternative explanation of the odor and as evidence that the poor water quality was not caused by the water refinement system.  As for the time gap, I likewise do not find that this necessarily makes the evidence irrelevant.  The condition of the home when the Cattaneos left it may give some indication of the way that it was maintained, particularly if the Cattaneos had the dog or dogs from the time they apparently moved in in 2005.

I elect to determine the relevance of this evidence in the context of the evidence presented at trial, from the Cattaneos but also from any other persons who were in the house in 2006 and are called to testify.  If the evidence is relevant, then I doubt I would find that unfair prejudice outweighs the probative value.  The jury is being asked to determine what caused the alleged contamination of the water and the foul odor attributed by the plaintiffs to it.  The jury should hear all evidence that reasonably and fairly bears on the causation issue.  Whether the Davis evidence passes that test remains to be seen.

**Order**

1. Motion #60 is GRANTED IN PART AND DENIED IN PART. The second claim is dismissed. Otherwise, the motion is denied.

2. Motion #74 is DENIED.

3. Motion #83 is DENIED.

4. Motion #87 is DENIED.

5. Motion #88 is GRANTED IN PART AND DENIED IN PART. Evidence concerning the Oregon matter is excluded. Evidence concerning the Yuma matter is not excluded.

6. Motion #101 is GRANTED.

7. Motion #102 is DENIED, subject to the Court's comments set forth above.

8. Motion #103 is DENIED, subject to the Court's comments set forth above.

DATED this 31st day of August, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge